## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| OSWALD LOOKSHIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-3834 |
| | § | |
| UNION PLANTERS BANK, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM AND OPINION

Oswald Lookshin sued Union Planters Bank, now Regions Bank, for allegedly allowing his estranged common-law wife, Pamela Lookshin, to have access to his safe deposit box without his authorization. Lookshin asserts that the box contained over $460,000 in cash, which was removed. Lookshin asserts causes of action for negligence; breach of contract; violations of the Texas Deceptive Trade Practices Act (DTPA) for misrepresentation and breach of warranty; and statutory and common-law fraud. Lookshin seeks economic damages for the loss of the cash as well as damages for mental anguish. Regions Bank moves for partial summary judgment on the breach of contract, negligence, DTPA, and mental-anguish damages claims. (Docket Entry Nos. 15, 16). Lookshin has responded. (Docket Entry Nos. 22, 23). Regions Bank has replied and objected to some of Lookshin's summary-judgment evidence. (Docket Entry Nos. 29, 30).

Based on careful consideration of the pleadings; the motions, responses, and replies; the parties' submissions; and the applicable law, this court grants in part and denies in part Regions Bank's motion for partial summary judgment.  The reasons are explained below.

## I.      The Summary Judgment Evidence

Lookshin filed an affidavit in which he describes the events that gave rise to this suit. (Docket Entry No. 23).  Both Lookshin and Regions Bank submitted copies of  records relating to the safe deposit box at issue.  (Docket Entry No. 15, Ex. A. Docket Entry No. 23, Exs. A–E).

Lookshin stated in his affidavit that on September 10, 2003, he went to the Bank office at 7075 North Freeway to rent a safe deposit box.  Lookshin wanted a box big enough to hold $460,000 in $100 bills.  Lookshin went to the Bank by himself.  (Docket Entry No. 23 at 2).  In his affidavit, Lookshin described a conversation with Kesha Rhodes, a Bank employee.  According to Lookshin, he told Rhodes that he wanted a large safe deposit box that he alone would use.  Lookshin did want his daughter, who lived out-of-state, to be able to access the box "if something happened to [Lookshin]."  (*Id*. at 3).  Rhodes told Lookshin that the Bank required an executed signature card from the daughter before she could have authority to access the box.  Rhodes prepared a signature card form for Lookshin to send to his daughter.  Lookshin took the card to mail to his daughter.

According to Lookshin, Rhodes told him that he should have someone else authorized to access the safe deposit box in case something happened to him before his daughter signed and returned the signature card.  Rhodes said that if something happened to Lookshin before

2

a second person was authorized to access the safe deposit box, the government could take the contents. (*Id.* at 4). Lookshin asserts that he decided to have his wife Pamela Lookshin sign a signature card because "Ms. Rhodes told me that she would take Pamela's name off of my new safe deposit box numbered 127 once the signature card signed by my daughter and me was returned from Florida." (*Id.*).

The same afternoon, Lookshin returned to the Bank with his wife, Pamela Lookshin. Lookshin claims that at that time Pamela Lookshin was his "estranged wife." (*Id.* at 1, 2). Rhodes typed in the information on the signature card for the safe deposit box. Both Lookshin and Pamela Lookshin signed, and Lookshin gave the card to the Bank. (Docket Entry No. 15, Ex. A at 1; Docket Entry No. 23 at 1).

The summary judgment record contains two versions of the signature card Lookshin and his wife executed. Lookshin submitted the "Customer" copy of the signature card. (Docket Entry No. 23, Ex. A). The Bank submitted the "Bank" copy of the same card. (Docket Entry No. 15, Ex. A). The signatures appear slightly different on each. The "Customer" copy has handwritten dates next to each signature; the "Bank" copy has no dates. The copies are otherwise identical.

The signature card had the following heading:

### SAFE DEPOSIT SIGNATURE CARD – CO-RENTERS

The names "OSWALD LOOKSHIN or PAMELA R LOOKSHIN" were directly below the heading. A separate heading, directly below the names, read: "**RENTAL AGREEMENT**." The text of the Rental Agreement stated in part as follows:

"OSWALD LOOKSHIN or PAMELA R LOOKSHIN, hereinafter "Renter" or "Lessee", applies to Union Planters Bank, N.A. – Houston, TX hereinafter "Financial Institution" or "Lessor", to rent the safe deposit box in accordance with the terms and conditions contained on this car and, in consideration of the rental and delivery of two keys to the box, the receipt of which is acknowledged, agrees to pay the rental fees and to comply in all respects with and be bound by the terms, conditions, rules, and regulations referred to or included in this Agreement.  Renter further agrees that:

1. The right of access to the box, and the right to remove all or any part of the contents or to surrender possession of the box, or to appoint an agent or deputy to perform any of the acts herein stated, may be exercised by each Renter without the consent of or notice to any other Renter or person.
. . . .

5. The Agent, if any listed below, is authorized to have full access to and control of the safe deposit box, and of the contents of the box, including the power to surrender the box and to release Lessor from all liability in connection with the box or its contents.  This authority shall remain in full force and effect until written notice of its revocation is received by Lessor below or until the death of the Renter. . . .

(Docket Entry No. 15, Ex. A at 1; Docket Entry No. 23, Ex. A at 1).

The signature card identified "OSWALD LOOKSHIN or PAMELA R LOOKSHIN" as the "Renter" or "Lessee."  Both Oswald and Pamela Lookshin signed as "Authorized Signers."  The signature card and rental agreement text stated that the Authorized Signers were "authorized to have full access to and control of the safe deposit box, and of the contents of the box."  The signature card had the same address and telephone numbers for both Oswald and Pamela Lookshin.

4

The reverse side of the signature card and rental agreement set out the "Rules and Regulations."  They  included the following:

>1.  Renter will abide by all the rules and regulations, whether adopted by Lessor or imposed by law, concerning the means of access to any safe deposit box rented, occupied, or used by Renter, and especially to the safe deposit box described above, and also concerning the disposition of the contents of the box, and the identification of the Renter, or of any of Renter's Agents.  Renter acknowledges that Lessor has no knowledge of the contents of the box.

>3.  If Lessor learns of any circumstances or conditions which in Lessor's judgment makes it reasonably possible that Lessor will incur any liability if access to the box is permitted, Lessor may refuse access to any and all persons with incurring any liability because of this refusal until such possibility of liability has passed. . . .

>4.  Upon mailing to Renter at the address designated on Lessor's box or otherwise delivering to Renter, or Renter's Agent or legal representative, a written notice, Lessor may, at any time, terminate the rental and possession of the box upon refunding the unearned portion of any advance payment of rental, in which event Renter will be entitled to the contents of the box upon surrender of all keys to the box.

>5.  Unless terminated under the foregoing paragraph or unless Renter provides written notice of termination and release to Lessor, this Agreement will automatically renew from year to year.

>. . . .

>9.  If Lessor uses reasonable care and diligence to prevent the admission of any unauthorized person to the box and otherwise prevent loss from fire, water, fire suppression system operation or malfunction, radiation, forces of nature, or any other cause whatsoever, Lessor shall not be responsible in any way for the box or its contents.  An opening of the box by an unauthorized

5

> person shall not be inferred from the loss or destruction of any
> of its contents.

(Docket Entry No. 15, Ex. A at 2; Docket Entry No. 23, Ex. A at 2).

In his affidavit, Lookshin stated that he put $460,000 in $100 bills in safe deposit box 127.  (Docket Entry No. 23 at 6).  He mailed the other signature card the Bank had given him, identifying his daughter as an "Authorized Signer," to his daughter in Florida.  This signature card had the same preprinted and individually typed provisions as the one signed by Lookshin and his wife on September 10, 2003, except that the second "Authorized Signer" was not "Pamela R Lookshin" but "Alvamay Lee Carroll," Lookshin's daughter. This signature card continued to identify "OSWALD LOOKSHIN or PAMELA R LOOKSHIN" as the "Renter" in three separate places.  Lookshin signed as an "Authorized Signer" and dated his signature September 10, 2003.  Alvamay Lee Carroll signed as the second "Authorized Signer" and dated her signature September 19, 2003.  Lookshin stated in his affidavit that a few days after he received the signed card back from his daughter, he took it to the Bank.  Lookshin gave the card to someone other than Rhodes, because she was not there.  (Docket Entry No. 23 at 5).  The Bank asserts that it has no record of this second signature card.

In January 2004, Lookshin asked the Bank for a third signature card because his daughter had moved and he wanted the card show her correct address.  This third card had the same preprinted and typed provisions as the other one his daughter signed.  Lookshin signed on January 5, 2004 and his daughter, Alvamay Lee Carroll, signed on January 12,

2004. Lookshin asserts that he returned the card to the Bank, again giving it to someone besides Rhodes. The Bank asserts that it has no record of this third signature card. This third signature card continued to identify "OSWALD LOOKSHIN or PAMELA R LOOKSHIN" as the "Renter" in three places. The only difference between this card and the original card Lookshin and Pamela Lookshin signed was that Alvamay Lee Carroll rather than Pamela R Lookshin was the second "Authorized Signer." (Docket Entry No. 23, Exs. B, C).

The Bank objects to the admission of the two signature cards bearing Alvamay Lee Carroll's signature on the ground that the predicate under Rule 803(6) of the Federal Rules of Evidence was not established. (Docket Entry No. 30 at 2). This objection is overruled. These documents are not admitted for the truth of their contents and do not require a foundation that allows admission under a hearsay exception. Instead, the documents are admitted as evidence that they were provided to Lookshin and signed by Lookshin and his daughter. The authentication requirements of Rule 901 are met.

No document Lookshin submitted states that Pamela Lookshin is removed from the safe deposit box rental agreement as either a "Renter" or as an "Authorized Signer." In his affidavit, Lookshin asserts that he personally gave Bank employees the two signature cards his daughter signed. Although the Bank disputes this, this court takes the evidence in the light most favorable to Lookshin in deciding the summary judgment motion. Both signature cards, like the one signed by Lookshin and his wife Pamela, identified "PAMELA R LOOKSHIN" as a "Renter," along with "OSWALD LOOKSHIN," in three separate places on the card. Neither of the two subsequently signed signature cards contains language stating

7

that Alvamay Lee Carroll and Oswald Lookshin were now the only "Authorized Signers" or that Pamela Lookshin was no longer an "Authorized Signer" or "Renter." Lookshin has not submitted evidence of written notice to the Bank revoking Pamela Lookshin's authority to access the safe deposit box as an "Authorized Signer" or terminating her rental agreement with the Bank, as required by the signature card and the rental agreement terms.

Lookshin asserts in his affidavit that he "knew" that as of the date he gave the Bank the second signature card, the first one his daughter signed, "Pamela Lookshin was not authorized" to access "my safe deposit box numbered 127." (Docket Entry No. 23 at 5). Regions Bank objects to this and similar statements in Lookshin's affidavit opining as to the legal significance of the signature card and rental agreement terms. (Docket Entry No, 30, p. 2-3). This court agrees that Lookshin is not qualified to give such an opinion and that any such opinion is not competent summary judgment evidence. The meaning of the signature card and the rental agreement terms is a legal matter for the court to decide. "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983)). The objection to these statements is sustained.

Lookshin asserts that on January 14, 2004, he removed some wills from the box and checked to be sure that the cash was still there. On March 29, 2004, he went back to the Bank and asked to access the box. Lookshin's keys did not work. The Bank arranged for a locksmith to drill the box open. The box did not contain the cash. Lookshin asserts that

8

he had never given a key to the box to anyone else and that the Bank was responsible for the loss because it had allowed Pamela Lookshin access to the box without authorization from him.  (Docket Entry No. 23 at 3).

Lookshin submitted a copy of  two pages entitled "Safe Deposit Box Entry Record." The pages show what purports to be dates when individuals accessed box 127.  Regions Bank objects to these two pages, asserting that they are not properly authenticated.  (Docket Entry No. 30 at 2–3).  Lookshin asserts that he received these copies from the Bank and offers them as admissions.  The authentication objection is overruled.  FED. R. EVID. 910.

Lookshin points to the fact that he is shown as the "Primary Renter" on the Entry Record forms and argues that this is inconsistent with treating Pamela Lookshin as a "co-renter."  The Bank objects to Lookshin's affidavit statement opining as to the significance of the term "Primary Renter" on the Entry Record forms.  Lookshin's assertion that the identification of himself as the "Primary Renter" means that Pamela Lookshin cannot be a "co-owner" or "co-renter" is a legal argument—although not made by a lawyer—and not admissible as competent summary judgment evidence.  The objection is sustained.

Texas law applies.  This is a diversity case.  The signature cards and rental agreements that Lookshin signed and submitted as submitted as summary judgment evidence specify that "[t]his Safe Deposit Rental Agreement is governed by and subject to all applicable laws of the State of Texas and all applicable federal laws."  (Docket Entry No. 15, Ex. A at 2; Docket Entry No. 23, Ex. A at 2).

9

Lookshin alleges that Regions Bank breached its contract with him by allowing Pamela Lookshin access to the safety deposit box after Lookshin had submitted the signature card signed by his daughter.  Lookshin also alleges  that the Bank was negligent in allowing Pamela Lookshin access to the box, in violation of the safe deposit box signature card signed by Lookshin and his daughter; in failing to notify Lookshin that the Bank had changed the locks on the box to give Pamela Lookshin access; in failing to have appropriate security and safeguards in place to prevent Pamela Lookshin from accessing the box without authorization; in failing to supervise employees to prevent Pamela Lookshin from accessing the box without authorization; and breaking the locks on the box without Lookshin's authorization.  Lookshin also alleges violations of the DTPA in that the Bank misrepresented the characteristics and provisions of the safe deposit box and breached one or more warranties owed to Lookshin.  Finally, Lookshin alleges fraud under Texas statutory and common law.  Lookshin seeks not only recovery of the cash taken, but also exemplary damages and mental-anguish damages.  In his affidavit, he asserts that since the loss of the money, "life is a nightmare." Lookshin describes headaches and vomiting as physical manifestations of the stress resulting from losing what he describes as his retirement fund.

The Bank seeks summary judgment as to the claims for breach of contract, negligence, DTPA violations, and mental anguish damages.  The Bank does not seek summary judgment as to the fraud claim.

## II.    The  Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.

The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. Exxonmobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

## III.   The Breach of Contract Claim

### A.   The Applicable Law

"The elements of a breach of contract claim under Texas law are: 1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages to the plaintiff resulting from the breach. *Lewis v. Bank of America, NA*, 343 F.3d 540, 544–45 (5th Cir. 2003 (citing *Palmer v. Espey Huston & Assocs.*, 84 S.W.3d 345, 353 (Tex. App. 2002—Corpus Christi, pet. denied)); *Adams v. H & H Meat Prods., Inc.*, 41 S.W.3d 762, 771 (Tex. App. – Corpus Christi 2001, no pet.);

*Prudential Sec., Inc. v. Haugland*, 973 S.W.2d 394, 397 (Tex. App.– El Paso 1998, pet. denied).  Whether a party has breached a contract is a question of law for the court.  *See Willis v. Donnelly*, 118 S.W.3d 10, 25-26 (Tex. App.– Houston 2003, no pet.); *Chappell Hill Bank v. Lane Bank Equip. Co.*, 38 S.W.3d 237, 245 (Tex. App.– Texarkana 2001, pet. denied). "The judge determines what conduct is required of the parties and, insofar as a dispute exists concerning the failure of a party to perform the contract, the judge submits the disputed fact questions to the jury." *Lafarge Corp. v. Wolff*, 977 S.W.2d 181, 186 (Tex. App.– Austin 1998, pet. denied).

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Petula Associates, Ltd. v. Dolco Packaging Corp.*, 240 F.3d 499, 504 (5th Cir. 2001).  Courts examine and consider a contract as a whole and give effect to all provisions.  *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983).  If the contract is worded so that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law.  *Id.*  Texas courts interpret contract terms "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive."  *Reilly v. Rangers Mgmt., Inc*., 727 S.W.2d 527, 530 (Tex. 1987).  As a last resort, if all other ordinary rules of construction leave reasonable doubt as to interpretation of a contract, the court should construe a contract

against its drafter.  *Forest Oil Corp. v. Strata Energy, Inc.*, 929 F.2d 1039, 1043 (5th Cir. 1991).

Extrinsic evidence is not admissible to contradict or vary the meaning of unambiguous language in a written contract and may not be used to create an ambiguity.  *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); *see also Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282-83 (Tex. 1996)(per curiam) (extrinsic evidence of the parties' subjective intent is immaterial).  Whether a contract is ambiguous is determined by looking at the agreement as a whole in light of the circumstances present when the parties entered the contract.  *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995).  An ambiguity does not arise simply because the parties advance conflicting contract interpretations.  *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex.1994). "If the agreement is ambiguous, summary judgment is improper because interpretation of the agreement is a fact question for the jury." *Childers v. Pumping Systems Inc.*, 968 F.2d 565, 569 (5th Cir. 1992); *Consol. Eng'g Co. v. Southern Steel Co.*, 699 S.W.2d 188, 192 (Tex. 1985).

A safe deposit box contract is treated as a lease contract under Texas law.

> In a safe deposit transaction the relationship of the safe deposit company and the renter is that of lessor and lessee and landlord and tenant, and the rights and liabilities of the safe deposit company are governed accordingly in the absence of a contract or statute to the contrary. The lessee is considered for all purposes to be in possession of the box and its contents.

TEX. FIN. CODE § 59.103.  Texas law provides that if there is more than one lessee, all the

lessees have a right to access the box and the lessor is not liable for access by any of the

designated lessees.

> (a) If a safe deposit box is leased in the name of two or more persons jointly or if a person other than the lessee is designated in the lease agreement as having a right of access to the box, each of those persons is entitled to have access to the box and to remove its contents in the absence of a contract to the contrary. This right of access and removal is not affected by the death or incapacity of another person who is a lessee or otherwise entitled to have access to the box.
>
> (b) A safe deposit company is not responsible for damage arising from access to a safe deposit box or removal of any of its contents by a person with a right of access to the box.

TEX. FIN. CODE § 59.106.

## B.    Analysis

All three signature cards for box 127 that Lookshin submitted as summary judgment

evidence include the term "co-renters" in the title and identified both Oswald Lookshin and

Pamela Lookshin as the "Renter" and "Lessee."  (Docket Entry No. 15, Ex. A; Docket Entry

No. 23, Ex. A; Ex B; Ex. C).  The signature card and rental agreement stated, consistent with

the Texas statute, that each "Lessee" and "Agent" was authorized to access the box, without

the need for notice to or consent from any other "Lessee" or "Agent."  Lookshin does not

dispute that he and Pamela Lookshin signed the first signature card he gave the Bank as

"Authorized Signers."  Lookshin argues that the two signature cards he and his daughter later

executed as "Authorized Signers" substituted his daughter for Pamela Lookshin as the "Co-

Renter," "Lessee,"and as the only other "Authorized Signer" besides himself.  (Docket Entry No. 23, Ex. C).

Lookshin's argument is contradicted by the language of the signature cards and rental agreements he submitted.  The signature cards  bearing the signatures of Lookshin and his daughter identify the "Renter" and "Lessee" as "OSWALD LOOKSHIN or PAMELA R LOOKSHIN" in three separate places.  The signature cards clearly state that each "Renter" has the right to access the box and to remove all or any part of the contents without the consent of or notice to any other renter or person.  The signature cards clearly state that any "Authorized Signer" is authorized to have full access to, and control of, the safe deposit box and its contents.  The rental agreement portion of the signature cards states that an "Agent, if any listed below, is authorized to have full access to and control of the safe deposit box. . . ."  (Docket Entry No. 23, Ex. A; Docket Entry No. 15, Ex. A).

The signature cards specifically address removing an Agent's authorization to access a safe deposit box.  An Agent's authority remains until the Bank receives written notice of its revocation.  (Docket Entry No.  23, Ex. A; Docket Entry No. 15, Ex. A).  The signature cards also state that the Bank may suspend access to the box to any person who has a right of access if the Bank is served with legal process involving that person.  The signature cards also state that the rental agreement continues unless the Lessee provide written notice of termination and release to the Lessor, the Bank.  Lookshin has not submitted evidence of written notice revoking Pamela Lookshin's authority as a "Authorized Signer" or terminating her rental agreement with the Bank.  Nor has Lookshin submitted any evidence that he served

16

the Bank with any legal document that would challenge or call into question Pamela Lookshin's status as a "Renter" or "Authorized Signer" authorized to access the box.  The fact that Lookshin's daughter signed as an "Authorized Signer" permitted her access to the box but did not remove Pamela Lookshin as an "Authorized Signer" or as a "Renter" permitted access to the box without Lookshin's consent.   (*Id.* at 2).  The signature cards signed by the daughter do not, as a matter of law, remove Pamela Lookshin as a "Renter" or an "Authorized Signer."

The Safe Deposit Access Record forms identify Lookshin as the "Primary Renter." The same forms provide a space for a "co-owner" to sign to access the safe deposit box. These Access Record forms do not state that a "Primary Renter" is the only renter authorized to access the safe-deposit box.  (Docket Entry No. 23, Exs. D, E).   Lookshin suggests that these forms modify the signature cards and rental agreements stating that Pamela Lookshin is a "Renter," "Lessee," and "Authorized Signer."  The signature card and rental agreement is not ambiguous; the subsequently completed Safe Deposit Access Record forms cannot change its meaning.  Those forms do not support Lookshin's argument that he was the only "Renter" authorized to access the box without notice to a "co-owner."

Nor does the evidence as to Rhodes's alleged statement that the Bank would substitute the daughter for the wife as the only other person authorized to access the box change the meaning of the signature card and rental agreement.  Each of the three signature cards states that Pamela Lookshin is a "Renter" who is authorized access to the box.  The signature cards also require written notice revoking an Agent's authority or terminating the rental agreement.

17

Lookshin did not submit evidence that Pamela Lookshin's status as a "Renter" or "Authorized Signer" with authority to access the safe-deposit box was revoked or terminated. "Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." *Tex. v. Am. Tobacco Co.*, 2006 WL 2522411 (5th Cir. 2006) (citing *Sun Oil Co. v. Madele*y, 626 S.W.2d 726, 732-33 (Tex.1982)).

Under Texas law, "whether a party has breached a contract is a question of law for the court, not a question of fact for the jury." *Willis v. Donnell*, 118 S.W.3d 10, 23 (Tex. App.—Houston 2003), *rev'd on other grounds*, 199 S.W.3d 262 (Tex. 2006). The undisputed summary judgment evidence is that in January 2004, Pamela Lookshin was a "Renter," "Lessee," and "Authorized Signer" for box 127, entitled to access without notice to or the consent of Oswald Lookshin. The Bank did not breach its contract with Lookshin in allowing Pamela Lookshin to access the box. (Docket Entry No. 15, Ex. A at 1; TEX. FIN. CODE § 59.106(b)). The Bank's motion for partial summary judgment as to Lookshin's breach of contract claim is granted.

## III.    The Negligence Claims

### A.    The Applicable Law

The Bank argues that Lookshin cannot proceed on his negligence claims because his suit is based on the parties' contract. Although a party's actions may breach duties in tort, contract, or both, Texas law is clear that "mere nonfeasance under a contract creates liability only for breach of contract." *Crawford v. Ace Sign, Inc*., 917 S.W.2d 12, 13 (Tex. 1996).

In determining whether a particular claim sounds in contract or tort, Texas courts generally analyze the source of the breached duty and the nature of the plaintiff's damages.  *See Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991).  Under Texas law, negligence requires a "legal duty owed by one person to another, breach of that duty, and damages proximately resulting from breach."  *Greater Houston Transportation Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). Summarizing the distinction between contract and tort, the Texas Supreme Court stated in *DeLanney* that "if the defendant's conduct . . . would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct . . . would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract." 809 S.W.2d at 493.  In addition, if the only injury suffered by the plaintiff is the economic loss to the subject of a contract to which the plaintiff is a party, the action sounds solely in contract.[1] *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986).

**B.    Analysis**

Lookshin alleges that the Bank was negligent in "[a]uthorizing Pamela Lookshin improper access," "failing to properly notify [Lookshin]," "failing to have an appropriate policy of security and safeguards," "failing to properly supervise its employees," and

---

[1]The Texas Supreme Court has allowed fraudulent inducement claims to sound in tort, even if the alleged fraud is subsumed in the contract terms.  *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998); *see also Heil Co. v. Polar Corp.*, 191 S.W.3d 805 (Tex. App.—Ft. Worth 2006, pet. filed).  The Bank has not sought summary judgment as to Lookshin's fraud claim.

19

"breaking the locks on the relevant safe deposit box."  (Docket Entry No. 12 at 11–12).  All these claims depend on the premise that Pamela Lookshin was not a "Renter," "Lessee," or "Authorized Signer" and that the Bank violated the rental agreement by allowing her to access the box without Lookshin's knowledge or consent.

The Bank's allegedly negligent conduct could give rise to liability only if, after the daughter signed the signature card, the Bank had a duty not to allow Pamela Lookshin access to the safe deposit box.  The only source of the Bank's duties to Lookshin with respect to the safe deposit box is the rental contract between Lookshin and the Bank.  Because the acts and omissions asserted as the basis for the negligence claims could not be a basis for liability absent the parties' contract, Lookshin's claims sound in contract, not negligence.  "If a party must rely on the duties created in the contract, or if the negligence claim alleges the breach of the very duties encompassed in a contract, the action is in substance an action on the contract."  *UMLIC  VP L.L.C. v. T & M Sales & Env. Sys., Inc.*, 176 S.W.3d 595 (Tex. App.—Corpus Christi 2005, pet. denied).   Summary judgment is granted as to Lookshin's negligence claims.

## IV.   The DTPA Claims

### A.      The Applicable Law

Lookshin asserts DTPA causes of action for misrepresentations as to the "characteristics and provisions of the safe deposit box" rented to him and breach of "one or more warranties" that the Bank owed him.  The "DTPA overlaps many common-law causes of action, including breach of contract, warranty, fraud, misrepresentation, and negligence."

*PPG Indust., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 89 (Tex.

2004).  A breach of contract is not sufficient to be a false, misleading, or deceptive act under

the DTPA.  *Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist.*, 987 S.W.2d

50, 53 (Tex.1998); *Crawford*, 917 S.W.2d at 14; *Mays v. Pierce*,  2006 WL 2729684, at *6

(Tex. App.—Houston Sep. 26, 2006); *Bekins Moving & Storage Co. v. Williams*, 947 S.W.2d

568, 577 (Tex. App.—Texarkana 1997, no pet.).    If the cause of action arises out of the

failure to fulfill a promise, the injury is governed by contract law, not the DTPA. *Crawford*,

917 S.W.2d at 14-15.

> The DPTA provides that false, misleading, or deceptive acts or practices include:
>
>> (5) representing that goods or services have sponsorship,
>> approval, characteristics, ingredients, uses, benefits, or
>> quantities which they do not have or that a person has a
>> sponsorship, approval, status, affiliation, or connection which he
>> does not;
>> . . .
>> (7) representing that goods or services are of a particular
>> standard, quality, or grade, or that goods are of a particular style
>> or model, if they are of another. . . .

Tex. Bus. & Com. Code Ann. § 17.46(b)(5), (7).

"The determination of whether a breach of contract rises to the level of a

misrepresentation sufficient to trigger the DTPA is a fact-driven inquiry." *Munawar v. Cadle*

*Co.*, 2 S.W.3d 12, 18 (Tex.App.-Corpus Christi 1999, no pet.); *Chilton Ins. Co. v. Pate &*

*Pate Enters., Inc.*, 930 S.W.2d 877, 890 (Tex.App.-San Antonio 1996, writ denied).

"Whether the facts, once ascertained, constitute a DTPA misrepresentation is a question of

law." *Munawar*, 2 S.W.3d at 18.  Courts look to the nature of the injury, whether the alleged

misrepresentations arise within or outside the contract, and whether the alleged harm is caused by the representations or the failure to perform the contract. *See, e.g, Crawford*, 917 S.W.2d at 14-15; *Mays v. Pierce*, 2006 WL 2729684, at *6.   When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone. *DeLanney*, 809 S.W.2d at 495.   Even if only economic loss results, misrepresentations "outside the contract" may be a DTPA violation.   In *Bekins*, 947 S.W.2d at 578, the court held that misrepresentations made by a moving company that it would use different methods than those actually used were actionable under the DTPA because the representations dealt with matters not addressed by the contract.   By contrast, in *Continental Dredging, Inc. v. De-Kaizered, Inc.*, 120 S.W.3d 380 (Tex.App.—Texarkana 2003, pet. denied), the court rejected the plaintiff's DTPA claim because the defendant's representations about the status of performance under the contract were "inside the bounds of the contract. . . .[and] rise only to a breach of contract, not a DTPA violation for a false, misleading, or deceptive act." *Id*. at 390.

Lookshin also alleges breach of warranty as a basis for his DTPA claim.   "The DTPA does not create a warranty; rather, it establishes a remedy for the breach of an independent warranty."   *Dow Agrosciences L.L.C. v. Bates*, 332 F.3d 323, 332 (5th Cir. 2003). "[W]arranties, both express and implied, actionable under the DTPA must be recognized by the common law or created by statute."   *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 438 (Tex. 1995).

**B.       Analysis**

In his misrepresentation claim under section 17.46(b) of the DTPA, Lookshin asserts that "Ms. Rhodes told me that she would take Pamela's name off of my new safe deposit box numbered 127 once the signature card signed by my daughter and me was returned from Florida."  (Docket Entry No. 23 at 4).  Lookshin does not allege or present evidence of a misrepresentation that is outside the terms of the signature card and rental agreement he signed and provided the Bank.  The signature card and rental agreement specify the steps necessary to remove an Authorized Signer or terminate the lease.  The card and agreement state that it is necessary to have a "written revocation" of an Authorized Signer's authority to access a safe deposit box and a written notice of termination by a Lessee.  The alleged misrepresentation is subsumed in the contract Lookshin subsequently executed.

In contrast to the plaintiff in *Bekins*, and similar to the plaintiff in *Continental Dredging*, the alleged misrepresentation in this case does not go beyond what is necessarily covered by the contract terms.  Pamela Lookshin's right of access to the box, and the steps necessary to remove that right of access, are covered in the signature card and the rental agreement.  Lookshin's misrepresentation claim does not arise under the DTPA. *See Bekins*, 947 S.W.2d 568; *Continental Dredging*, 120 S.W.3d 380; *Mays*, 2006 WL 2729684.

Nor can Lookshin base a DTPA violation on a breach of warranty.  An implied duty "attaches only to the performance of acts the parties agreed to perform." *City of Austin v. Houston Lighting & Power Co.*, 844 S.W.2d 773, 784 (Tex. App.—Dallas 1992, writ denied).  Lookshin has not alleged or presented summary judgment evidence of an implied

23

duty to perform specified acts based on the contract terms.  *See La Sara Grain Co. v. First Nat. Bank of Mecedes*, 673 S.W.2d 558, 565 (Tex. 1984) (finding no implied warranty that a bank must not honor a check with an unauthorized signature that could violate the DTPA; "the bank's implied promise that it will not pay checks on an unauthorized signature is not a warranty, but only an implied term of the contract. A mere breach of contract is not a violation of the DTPA.").  *Id.*  Lookshin neither alleges nor presents summary judgment evidence of an express warranty that was breached.  Summary judgment is granted as to the DTPA claims.

## IV.    The Mental-Anguish Damages Claim

### A.    The Applicable Law

The Texas Supreme Court has limited the circumstances in which mental-anguish damages are recoverable:

> Mental anguish damages are recoverable for some common law torts that generally involve intentional or malicious conduct such as libel and battery, and by analogy for knowing violations of certain statutes such as the Deceptive Trade Practices Act. This is appropriate because the high level of culpability affects the determination of proximate cause, and makes it just that the defendant should bear the risk of any overcompensation that an award of mental anguish damages in a particular case might entail. []
>
> Moreover, even where the defendant's conduct was merely negligent, Texas has authorized recovery of mental anguish damages in virtually all personal injury actions. Similarly, when the defendant's negligence causes a mental shock which produces a serious bodily injury, the defendant is liable for that injury provided it was foreseeable, and mental anguish is one

24

> element of damages just as it would be for any other serious
> injury. []
>
> Mental anguish is also compensable as the foreseeable result of
> a breach of duty arising out of certain special relationships.
> These include the physician-patient relationship, perhaps
> because most physicians' negligence also causes bodily injury,
> and a very limited number of contracts dealing with intensely
> emotional noncommercial subjects such as preparing a corpse
> for burial, or delivering news of a family emergency.  In an
> earlier era, courts found a special relationship of this sort
> between railroads and their passengers. We have made it clear,
> however, that most relationships, whether legal or personal,
> create no duty to avoid causing mental anguish.

*City of Tyler v. Likes*, 962 S.W.2d 489, 495–96 (Tex. 1997) (citations omitted).  In *Likes*, the

Texas Supreme Court found that a city was not liable for mental-anguish damages resulting

from the flooding of the plaintiff's home.  In *Douglas v. Delp*, 987 S.W.2d 879, 885 (Tex.

1999), the Texas Supreme Court held that a plaintiff cannot recover for mental anguish

suffered as a consequence of economic losses caused by the defendant's legal malpractice.

987 S.W.2d at 884.  Mental-anguish damages that result from economic losses are not

compensable.  *Id*. at 885.

## B.    Analysis

Lookshin claims that his mental anguish is sufficiently physically severe to allow him

to recover damages.   He cites *Northshore Bank v. Palmer*, 525 S.W.2d 718 (Tex.

App.–Houston 1975, writ denied n.r.e.), in which the court allowed mental-anguish damages

in a case involving a bank mishandling a check.  (Docket Entry No. 22 at 6–7).  Lookshin

does not take into account the more recent Texas cases making it clear that a plaintiff may

not recover damages for mental anguish resulting from economic losses that are the subject of a contract. *See, e.g., Douglas v. Delp*, 987 S.W.2d at 885; *Bekins*, 947 S.W.2d at 577 (finding mental anguish resulting from the loss of property that was the subject of a moving contract could not be the basis for damages; the mental anguish was caused by Bekins's treatment of the plaintiff's property—not by any direct or intentional tort against her personally.").

Lookshin's own evidence shows that his mental anguish is a result of the economic loss of the safe deposit box contents. Summary judgment is granted as to the mental anguish damages claim.

## V.     Conclusion

Regions Bank's motion for partial summary judgment is granted as to the breach of contract, negligence, DTPA, and mental-anguish damages claims. (Docket Entry No. 15 at 4–5). The fraud claim remains to be decided.

SIGNED on October 30, 2006, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge